**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**AMHEL ANTONIO IGLESIAS,**
　　Plaintiff,

　　v.

**COMMISSIONER OF SOCIAL
SECURITY,**
　　Defendant.

Civil No. 22-1144 (BJM)

**OPINION & ORDER**

　　Amhel Antonio Iglesias ("Iglesias") seeks review of the Social Security Administration Commissioner's ("the Commissioner's") finding that he is not entitled to benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Iglesias contends that the administrative law judge ("ALJ") wrongly concluded that (1) Iglesias's impairments did not meet the level of a "Listed" impairment; (2) he has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with some non-exertional limitations; and (3) he could perform the jobs listed by a vocational expert ("VE"). Docket No. ("Dkt.") 21. The Commissioner opposed, Dkt. 25. This case is before me by consent of the parties. Dkts. 1-3, 8. For the reasons set forth below, the Commissioner's decision is **AFFIRMED.**

**APPLICABLE LEGAL STANDARDS**

　　After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Hum. Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are

not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health & Hum. Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Sec'y of Health & Hum. Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At Step One, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At Step Two, the

Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At Step Three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1 (the "Listings"), which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to Step Four, through which the ALJ assesses the claimant's RFC and determines whether the impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final Step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At Steps One through Four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rodríguez v. Sec'y of Health & Hum. Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under Step Five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz*, 890 F.2d at 524. Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Sec'y of Health & Hum. Services*, 818 F.2d 96, 97 (1st Cir. 1986).

# BACKGROUND

## A. Medical History

The following is a summary of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the Social Security transcript. Because Iglesias only challenges the ALJ's finding regarding his mental health, Dkt. 21, I only discuss the medical records addressing this issue.

### *Treating Sources*

#### Dr. Eugene Herrman, Ph.D.

Dr. Herrman examined Iglesias on December 31, 2011. Tr. 730–36. He found Iglesias behaved appropriately and related well during the interview. Tr. 733. Dr. Herrman found Iglesias's attention and concentration were fair, his immediate and recent memory suffered from deficits, and he demonstrated good insight. *Id.* However, he found Iglesias showed questionable judgment based on his reports of substance abuse and threatening behavior toward his wife that resulted in a restraining order. Tr. 733. Dr. Herrman noted Iglesias reported being depressed most of the time due to his job loss and recent divorce, but that he denied suicidal and homicidal ideation. Tr. 734. And though Iglesias reported seeing shadows when asked about hallucinations, he denied auditory hallucinations, paranoid and grandiose delusions, and phobias. *Id.*

Dr. Herrman found Iglesias showed significant symptoms of depression and memory problems that would interfere with his ability to maintain full-time work. Tr. 735. He determined Iglesias would struggle to cope with stress or remember instructions in an average work setting. *Id.* Additionally, he believed Iglesias would benefit from assistance on how to manage personal finances. *Id.* Lastly, he recommended antidepressant medication and psychotherapy. Tr. 736.

### Dr. Luis Umpierre, Psy. D

Dr. Umpierre, a consultative examiner, evaluated Iglesias in June 2015. Tr. 82–95. He found Iglesias's treatment record showed a history of depression and substance abuse, but that he ceased using drugs and exhibited progressive stabilization. Tr. 93. Further, though Iglesias still manifested memory and socialization problems, he remained able to learn, understand, remember, and execute simple instructions. *Id.* Additionally, he could sustain pace, maintain attention, and persist at work activities without special supervision for a normal workday and workweek. *Id.* Lastly, Dr. Umpierre found Iglesias could adjust to changes in work routines and environments as well as interact with the public, coworkers, and supervisors. *Id.* Dr. Umpierre found Iglesias's condition satisfied neither the Paragraph A nor C criteria of listing 12.04. Tr. 89. Further, he found either moderate or no limitations in the Paragraph B criteria. *Id.* Accordingly, he determined Iglesias was not disabled. Tr. 95.

### Dr. Barbara Hernandez, Psy. D

Dr. Hernandez, a consultative examiner, evaluated Iglesias at the reconsideration stage. Tr. 97–112. After noting Iglesias's allegations that his symptoms had worsened and that additional medical evidence was requested but not received, Dr. Hernandez adopted Dr. Umpierre's decision in its entirety. Tr. 104. Accordingly, she found Iglesias was not disabled. Tr. 112.

### Mental Health and Anti-Addiction Services Administration

Iglesias received treatment from the Mental Health and Anti-Addiction Services Administration (abbreviated as "ASSMCA" based on its Spanish name). There, he tested negative for all substances except BZD (presumably benzodiazepine). Tr. 399. Next to Iglesias's positive result, his doctor noted that he was taking Klonopin per his doctor's orders. *Id.* During a May 2014 evaluation, Iglesias's doctor noted he had good hygiene, good eye contract, was alert, cooperated,

paid attention, spoke normally, and demonstrated an appropriate affect. Tr. 411. However, he was anxious and depressed. *Id.* All other findings were normal except for a handicapped intermediate memory and superficial insight. *Id.* However, at a June 2014 psychiatric appointment, he reported feeling depressed and the doctor noted he cried profusely during the interview. Tr. 409. Iglesias was referred to an intensive outpatient service that same month. Tr. 408. There, he recounted his substance use history and explained that it led to his discharge from the army. Tr. 404. At an appointment near the end of June 2014, Iglesias's doctor observed he was anxious, had limited intermediate memory, and showed superficial insight, but was otherwise normal. Tr. 406. By August 2014, Iglesias reported doing well and was taking 10mg of Ambien and 20mg of Paxil. Tr. 402. That month, after observing Iglesias satisfactorily complied with treatment and demonstrated good participation in its program, ASSMCA referred him to a homeless services center. Tr. 419. Iglesias moved to that program in the same month and was free of drugs and alcohol at that time. Tr. 420.

**Pavia Hospital – Hato Rey**

Iglesias was voluntarily admitted to Pavia Hospital on April 8, 2014 and discharged the following day. Tr. 493. When he was admitted, nurses noted his anxiety and depression and that his visit was triggered by a suicide plan. Tr. 501, 505. He reported anxiety, irritability, unease, lack of sleep, sadness, death wishes, feelings of failure, crying, an inability to concentrate, fear, visions, and hearing noises. Tr. 502. Doctors found his insight and judgment had deteriorated, he was unkempt, but he was otherwise doing well. Tr. 516. He was assessed as a low risk for suicide and given a GAF score of 20. Tr. 505, 510. Pavia Hospital administered 0.5mg of Klonopin, 15mg of Restoril, 0.5mg of Risperdal, and 15mg of Celexa. Tr. 518. Upon his release, he was diagnosed with a major depressive disorder but denied thoughts of suicide, homicide, and hallucinations. Tr.

493, 507. Doctors found him stable and recommended outpatient treatment, supervision, and prescription medication. Tr. 493. He stated he understood their recommendations. *Id.*

**Dr. Rodriguez Olaverri**

Dr. Rodriguez Olaverri treated Iglesias from September 2014 to January 2015. Tr. 658–666. During this time, he found Iglesias had major depression and memory loss, provided reassurance, and encouraged observation. Tr. 660, 663, 666.

**Dr. Maria T. Margarida Julia**

Dr. Margarida Julia evaluated Iglesias in November 2014. Tr. 689–98. She found him cooperative and oriented as to time and place, although he could not remember the date. Tr. 690. Dr. Margarida Julia then noted Iglesias was somewhat anxious, downcast, and depressed about what he perceived to be cognitive changes. *Id.* She also noted a significant difficulty managing frustration because Iglesias was trembling when he found some tests difficult. *Id.* Further, Iglesias made little eye contact and exhibited motor and reaction time slowness. *Id.* However, Dr. Margarida Julia found Iglesias sustained adequate levels of attention, cooperation, and mental effort while his expressive and receptive language skills were intact. *Id.*

After performing various tests, Dr. Margarida Julia found Iglesias's general cognitive functioning below average for his age. Tr. 691. She also noted a severe handicap in memory functions, but described his attention and conceptualization as well-preserved given the context of his memory condition. *Id.* Further, she noted Iglesias exhibited a mild handicap in initiation and visual-constructive skills. *Id.* Dr. Margarida Julia found Iglesias had a severe memory impediment because he could only remember three out of five words even after being given multiple choice hints. *Id.* She further found a poor level of spontaneous recovery and a significantly deteriorated immediate memory capacity. Tr. 692. Additionally, Iglesias's long-term memory measured

significantly below expected and he showed a severe impediment for learning new information. Tr. 691. Dr. Margarida Julia next found Iglesias's executive functions were well-preserved but with mild handicaps in problem solving, processing velocity, and cognitive flexibility. Tr. 692. Lastly, she found his self-reports reflected concerning factors of depression and a functional handicap. *Id.*

In her conclusion, Dr. Margarida Julia recommended psychotherapeutic follow-up to help Iglesias manage his condition's effect on his daily life and personal relationships. Tr. 692–93. However, she found insufficient evidence of neuropsychological criteria associated with a degenerative process. Tr. 693. Accordingly, she recommended he register with a vocational rehabilitation program, start psychotherapy, make a physical exercise routine, adopt various organization strategies to aid his memory, use mental stimulation computer programs, and participate in pleasurable and interesting activities. Tr. 693–94.

**Dr. Yaleska Colón Córdova, Psy. D.**

At a May 2015 evaluation, Dr. Colón Córdova observed Iglesias was casually dressed; adequately groomed; verbal, articulate, and responding appropriately to questions; cooperative and friendly; and his thoughts were logical, coherent, and tangential. Tr. 669. However, she noted he was anxious with a flat affect and depressed mood, but regular impulse control. *Id.* She found he denied suicidal and homicidal ideas; his psychomotor activity was slow; and he was oriented to person, time, and place. *Id.* Further, she noted his memory was adequate because he could recall three of eight words mentioned one minute prior and could remember past events. *Id.* She observed his attention and concentration were adequate because he could spell "mundo" ("world" in Spanish) backwards and forwards and compute serial sevens. Tr. 669–70. Further, Dr. Colón Córdova characterized Iglesias's judgment in routine matters as broadly adequate. Tr. 670.

Accordingly, she diagnosed Iglesias with major depression, recurrent, severe, moderate. Tr. 671. Based on Iglesias's mild to moderate psychological symptoms, Dr. Colón Córdova found he could handle funds. *Id.*

**Dr. Jorge Mundo Sagardia**

Dr. Mundo Sagardia physically examined Iglesias in June 2015. He noted mostly normal physical health findings but wrote that Iglesias suffered from depression. Tr. 676.

**APS Clinics**

Iglesias visited APS Clinics intermittently from April 2014 to January 2019. Tr. 711–22, 973–1029, 1052–73, 1096–1119. In April 2014, his symptoms were in remission, but he was prescribed Celexa, Vistaril, Risperdal, and Clonazepam in addition to the Klonopin, Ambien, and Wellbutrin he reported already taking. Tr. 718, 722. In October 2014, he appeared anxious and reported sleep problems along with a lack of motivation, but was otherwise normal. Tr. 721–22. By August 2015, he again appeared normal aside from his depression and anxiety diagnoses. Tr. 711–16.

Iglesias returned to APS Clinics in November 2016. Tr. 1017. At that time, he had not seen a psychiatrist in more than six months. *Id.* However, he appeared calm with the medications prescribed during his stay at Pavia Hospital. *Id.* Despite his depression and anxiety diagnoses, Iglesias was oriented to time, place, and person and his memory was intact. Tr. 1018–19. Additionally, he reported no violence or abuse of others and no thoughts of suicide or homicide. Tr. 1018. He remained stable in December 2016. Tr. 1012–13. Further, he reported doing well in January 2017 and his behavior appeared normal at that time. Tr. 1005–07. In March 2017, he was listed as stable. Tr. 1029. The examining doctor found Iglesias had an appropriate appearance and verbal expressions as well as normal and logical impulses. Tr. 1028. Further, he was oriented to

time, place, and person and his memory was intact. *Id.* Additionally, he reported no violence or abuse of others and no thoughts of suicide or homicide. Tr. 1028. When he arrived at a May 2017 appointment to obtain medication refills, Iglesias again appeared normal except for decreased concentration. Tr. 998–1000.

At his January 2018 appointment, Iglesias reported feeling anxious, which he said often happens when he does not take his medications. Tr. 991. During the evaluation, he appeared calm with an appropriate affect, and logical though process. Tr. 992. Further, he reported no suicidal or homicidal ideas. *Id.* However, his concentration and insight were decreased and his judgment was fair, as opposed to good. Tr. 993. In April of that year, Iglesias reported feeling good while undergoing his treatment. Tr. 983. He behaved appropriately and cooperatively while demonstrating intact orientation and memory. Tr. 985–86.

In July 2018, Iglesias reported feeling sad because his brother went to the United States. Tr. 976. However, he said he was responding well to treatment and reported no side effects. *Id.* Further, he behaved appropriately, was oriented, had intact memory, could concentrate, showed good judgment, and demonstrated adequate insight. Tr. 977–78. In October, Iglesias reported he continued to be well despite adapting to a dental prosthesis. Tr. 1060. Similarly, APS's evaluation revealed normal findings. Tr. 1061–62.

In January 2019, Iglesias said he was handling his anxiety, but was worried about the economy and crime. Tr. 1053. He further said he stopped hearing voices thanks to medication and medicinal side effects as well as suicidal or homicidal thoughts. *Id.* APS's evaluation again showed normal findings. Tr. 1054–55. The last evaluation in the record, from July 2019, shows Iglesias reported feeling well but with high blood pressure and irritability. Tr. 1099, 1112. At that time,

APS's evaluation showed normal mental health findings except for fair judgment and decreased insight. Tr. 1109–10.

**B. Procedural History**

Iglesias filed an application for disability benefits on February 24, 2015 claiming an onset date of October 15, 2013. Tr. 81, 82. On November 20, 2019, Iglesias appeared at a hearing before an ALJ. Tr. 18. He testified he had completed high school and served in the army for ten years before receiving an other-than-honorable discharge. Tr. 46. Iglesias averred that he previously worked as a truck driver, but stopped in 2013. Tr. 47. Additionally, he said he worked a seasonal dock builder for two years ending in 2015. Tr. 47–48. He further stated he worked a variety of temporary jobs in apartment maintenance, parking trailers, assembling doors and installing docks for air conditioning. Tr. 49–51. Iglesias then testified he could no longer work due to his depression and his resulting inability to comprehend instructions. Tr. 52. As a result, he was laid off from his dock-building job. Tr. 52–53. Though he applied for work, he could only find what he described as odd jobs in construction, which he performed for about two or three years. Tr. 53. Further, he did not apply for unemployment benefits. *Id.* He then said his conditioned worsened around the time he moved to Puerto Rico in 2015 and he did not work after that time. Tr. 53–54.

As for his treatment, Iglesias testified he began taking Seroquil and an anti-anxiety medication in 2016. Tr. 54–55. This, he said, helped improve his concentration a little bit. Tr. 55. He testified he began seeing a psychiatrist around once per week when he moved to Puerto Rico in either 2015 or 2016. Tr. 56–57. However, as of 2019, he only saw the psychiatrist when necessary, which he estimated was about once per month. Tr. 57. He also said he saw a psychologist around nine or ten times due to his depression, but stopped due to issues with his health insurance. *Id.* Further, he said he was hospitalized at some point after talking about suicide,

but could not remember when this occurred. Tr. 58. He added that his depression affected him strongly at that time because he was not receiving the proper medication. *Id.* Lastly, though he admittedly used illicit drugs in the past, he testified he had not done so for years. *Id.*

The ALJ next asked Iglesias how his depression affects his work and personal life. He responded that it affects his ability to concentrate, take directions, complete tasks, and remember. *Id.* He said he knows his neighbor across the hall, but generally does not associate with others. *Id.* He further testified he got along well with his family, but had few friends because most had died. Tr. 58–59. When asked what he does on a normal day, Iglesias said he gets up at 9:00 or 10:00 a.m. if he does not take his medication, but, if he does, he will often sleep until 1:00 or 2:00 p.m. Tr. 59. In either case, he generally calls his siblings to see what he can do to help them and his day unfolds accordingly. *Id.* As an example, he said he sometimes helps his sister clean the salon she owns approximately 15 to 20 miles from his home. *Id.*

However, Iglesias's sister also helps him grocery shop so he does not buy things he already has and helps him cook because she fears he will start a fire. Tr. 59–60. Still, Iglesias manages taking his own medication independently and bathes daily. *Id.* Lastly, though he watches television, he testified he no longer reads. Tr. 60.

Under questioning by his attorney, Iglesias stated he becomes enormously frustrated while visiting government offices in Puerto Rico and is sometimes asked to leave after arguing with workers. Tr. 61. Further, he said he sometimes abstains from taking his medication because of its effect on his sleep, but that his doctor disapproved of this practice and recommended against it. Tr. 62. He also testified he repeatedly thinks of death and suicide. Tr. 62. However, he has shared these thoughts with doctors and said they, along with his medicine, have helped him avoid dwelling on these ideas. Tr. 62–63. He further said he must write appointments and events on a big board

or he will forget them and that he is unable to complete a list of instructions. Tr. 63. As examples, he said he cannot finish reading a book and, if his sister sends him to the store, he will only return with half of the items she requested. Tr. 64. Lastly, he described his energy level as okay, but added that he did not feel like doing anything. *Id.*

Next, medical expert, Dr. Windalis Caro, testified. After finding Iglesias had five of the symptoms delineated in paragraph A of Listing 12.04, Dr. Caro stated Iglesias had only moderate limitations in the Paragraph B criteria of that Listing. Tr. 69. Accordingly, since Iglesias's hospitalization in 2014, Dr. Caro found Iglesias could understand, remember, and carry out instructions; perform simple, repetitive, routine tasks; use judgment limited to simple, work-related decisions; deal with changes in the work setting limited also to simple decisions; interact with the public occasionally; and interact with coworkers and supervisors frequently. Tr. 69–70. Further, Dr. Caro found Iglesias could handle his own funds. Tr. 69.

A VE, Alina Kurtanich, also testified. She stated that Iglesias was previously employed as a semi-truck driver (DOT 904.383-010), hostler (DOT 909.633-010), door assembler, (DOT 806.684-050), maintenance worker (DOT 381.687-018), and HVAC worker (DOT 637.664-010). Tr. 71–72. The ALJ asked the VE to consider that Iglesias was 56 years old on his alleged onset date and 60 on his date last insured. Tr. 76. Further, she noted he had a high school education, military experience, and the work history described above. *Id.* The ALJ asked whether a hypothetical person with this background and no physical limitations could perform any of Iglesias's past work given the following mental limitations: he can perform simple, repetitive, routine tasks; his use of judgment and his ability to adapt to changes in the work setting is limited to simple, work-related decisions; he can have contact with coworkers and supervisors frequently and with the public occasionally. *Id.* The VE concluded that Iglesias could perform none of his

prior jobs except the maintenance worker position (DOT 381-687-018). *Id.* Additionally, the VE found Iglesias could work as a laundry worker (DOT 361.684-014), inspector/sorter (DOT 369.687-026), and hand packager (DOT 920.587-018). Tr. 76–77. Next, the ALJ asked the VE if someone could perform Iglesias's past work given the limitations described above and the following physical restrictions: no exposure to ladders, ropes, scaffolds, or unprotected heights; can drive occasionally; and can be exposed to moving mechanical parts occasionally. Tr. 77. Again, the VE responded that such a person could perform none of Iglesias's prior work except the maintenance worker position (DOT 381-687-018). *Id.*

The ALJ announced her decision on November 29, 2019. Tr. 15–35. The ALJ found that, despite working odd jobs, Iglesias had not engaged in substantial gainful activity since the alleged onset date. Tr. 20. Further, he had the severe impairments of major depressive disorder and anxiety disorder. *Id.*

Proceeding to Step Three, the ALJ found Iglesias did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. *Id.* In support of this determination, the ALJ noted that she had considered Listings 12.04 and 12.06, but that Iglesias's conditions did not satisfy the required criteria. Tr. 21–23. Regarding Listing 12.04, the ALJ did not mention the Paragraph A criteria, but found Iglesias did not satisfy the Paragraph B criteria. Tr. 21–22. Further, she found the Paragraph C criteria were not satisfied, because the record did not establish Iglesias's "minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life." Tr. 22.

Regarding Listing 12.04, the ALJ found Iglesias had moderate limitations in all four of the Paragraph B functional areas, which are as follows: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting

and managing oneself. *Id.* After noting Iglesias's testimony that he struggles remembering and understanding conversations, following instructions, and completing tasks, the ALJ observed that he also said he could perform simple maintenance and shop. *Id.* Further, she noted the record showed he could provide information about his health. *Id.* Lastly, she observed consultative examination testing showed that Iglesias could remember remote events, recall personal information, and recite three out of eight words stated to him one minute previously. *Id.*

As for interacting with others, the ALJ noted Iglesias's testimony that he had difficulty socializing. *Id.* However, she observed Iglesias shopped and spent time with his family. *Id.* Further, evidence showed he had good rapport with doctors and was described as pleasant and cooperative during medical appointments. *Id.*

Regarding concentrating, persisting, and maintaining pace, the ALJ noted Iglesias could drive and prepare meals. *Id.* Further, throughout his psychological evaluation, he could concentrate on questions asked and provide answers about his medical and employment history. *Id.* Also, he could also spell "mundo" (meaning "world" in Spanish) backwards and forwards. *Id.* However, the ALJ noted he sometimes exhibited diminished concentration. *Id.*

The ALJ found Iglesias alleged no symptoms relating to adapting or managing oneself. *Id.* Additionally, she noted Iglesias said he could handle self-care and personal hygiene and the objective evidence in the record showed his grooming and hygiene were appropriate. *Id.*

The ALJ then proceeded to Step 4. In determining Iglesias's RFC, the ALJ noted that he suffered from a major depressive disorder and an anxiety disorder. Tr. 24. She found that, consistent with those diagnoses, Iglesias was hospitalized in April 2014 due to exacerbation of his symptoms including anhedonia, insomnia, anxiety, crying spells, and hallucinations. *Id.* As a result, she noted Iglesias was diagnosed with major depressive disorder with psychotic features for

which he was prescribed multiple psychotropic medications. *Id.* The ALJ then observed that Iglesias was hospitalized for psychiatric issues in May 2014 for ten days. *Id.* Though Iglesias was depressed during this time, the ALJ found that progress notes showed he was cooperative and had adequate hygiene. *Id.* Further, he was relevant, logical, and coherent and had adequate impulse control and judgment. *Id.* During this second hospitalization, doctors diagnosed Iglesias with major depressive disorder, recurrent, psychotic features, opioids dependence in remission, and cocaine dependence in early remission. *Id.* The ALJ found that, after Iglesias's discharge, he received psychiatric treatment from June to September 2014. *Id.* During this time, his diagnosis remained unchanged except that his cocaine dependence went into remission. *Id.*

Next, the ALJ noted Iglesias had three neurology visits between September 2014 and January 2015 with Dr. Rodriguez Olaverri. At these appointments, the ALJ found Iglesias reported memory problems and was diagnosed with memory loss and major depressive disorder, not otherwise specified. *Id.*

The ALJ then discussed Dr. Margarida Julia's November 2014 neuropsychological examination. At that time, the ALJ found Iglesias reported a tendency to lose track of where he placed things, forget dates, and become disoriented. *Id.* Though Dr. Margarida Julia's evaluation and interview suggested moderate changes in Iglesias's capacity to remember, the ALJ noted Dr. Margarida Julia found insufficient evidence to diagnose Iglesias with a degenerative condition. *Id.*

The ALJ moved on to Iglesias's treatment at APS Clinics. She first noted there was a significant gap in treatment. *Id.* Then, she found the records showed Iglesias had adequate hygiene; was logical, relevant, and coherent; and had adequate memory, concentration, insight, and judgment. *Id.* However, she noted Iglesias was diagnosed with major depressive disorder, recurrent episode, severe, without mention of psychotic behavior. Tr. 24–25. And though she found

Iglesias's concentration was diminished at times, she observed that he reported feeling better with treatment. Tr. 25.

The ALJ next recounted Iglesias's May 2015 consultative examination with Dr. Colón Córdova. Iglesias told Dr. Colón Córdova his history of depression and drug use and that he was currently experiencing anxiety, anger, anhedonia, sadness, and loss of energy. *Id.* Further, he reported trouble falling asleep, a desire to avoid people, and an inability to complete tasks. *Id.* The ALJ noted Dr. Colón Córdova's observations that Iglesias was casually dressed; adequately groomed; verbal, articulate, and responding appropriately to questions; cooperative and friendly; and his thoughts were logical, coherent, and tangential. *Id.* However, she noted he was anxious with a flat affect and depressed mood, but regular impulse control. *Id.* She found he denied suicidal and homicidal ideas; his psychomotor activity was slow; and he was oriented to person, time, and place. *Id.* Further, she noted his memory was adequate because he could recall three of eight words mentioned one minute prior and could remember past events. *Id.* She observed his attention and concentration were adequate because he could spell "mundo" backwards and forwards and compute serial sevens. *Id.* Further, the ALJ found Dr. Colón Córdova characterized Iglesias's judgment in routine matters as broadly adequate. *Id.* Accordingly, Dr. Colón Córdova diagnosed Iglesias with major depression, recurrent, severe, moderate. *Id.*

However, the ALJ found that Iglesias responded well to treatment. For example, she observed there was no evidence of hospitalization after Iglesias's discharge in June 2014. *Id.* She also noted no evidence of emergency treatment for anxiety and depression. *Id.* Additionally, she found Iglesias did not suffer from suicidal ideation, homicidal ideation, or psychosis. *Id.* Lastly, she cited a gap in treatment because Iglesias reported he had not seen a psychiatrist for six months. *Id.*

The ALJ next examined Dr. Caro's hearing testimony regarding Iglesias's condition. The ALJ noted Dr. Caro's diagnosis that Iglesias has a major depressive disorder. *Id.* The ALJ further summarized Dr. Caro's findings that Iglesias had moderate limitations in the Paragraph B criteria of Listing 12.04. *Id.* The ALJ considered these findings persuasive because Dr. Caro is familiar with the Social Security Administration's guidelines, reviewed the complete record, and offered a detailed explanation of her reasoning. Tr. 26.

The ALJ then examined Dr. Herrman's opinion that Iglesias could not work full time due to depression symptoms and possible cognitive and/or memory deficits associated with long-term substance dependence and a history of head injury. *Id.* Nevertheless, the ALJ found this opinion unpersuasive because it occurred outside the relevant period and an evaluation during that period confirmed no cognitive problems. *Id.*

The ALJ next cited Iglesias's GAF ratings which she said ranged from 20 to 75. *Id.* She found these scores were not persuasive because GAF ratings are inherently subjective and those at issue here lacked elaborate explanation. *Id.* She found Dr. Colón Córdova's opinion that Iglesias could handle funds persuasive because it was consistent with the ALJ's medical findings including Dr. Suria's description of Iglesias as logical, relevant, and coherent. *Id.* Lastly, the ALJ found persuasive the state medical consultants' opinions that Iglesias could perform simple instructions, concentrate for two-hour intervals on simple tasks, and interact with others. *Id.*

Accordingly, the ALJ concluded Iglesias could perform simple, routine, repetitive tasks and make simple work-related decisions. Tr. 23. Further, he could interact frequently with supervisors and coworkers, and occasionally with the public. *Id.* Additionally, he could occasionally be exposed to moving mechanical parts and operating a motor vehicle. *Id.* Thus, the ALJ determined Iglesias could perform his past relevant job of maintenance worker. Tr. 26. In

making this finding, the ALJ cited the VE's testimony and her determination that this testimony was consistent with the Dictionary of Occupational Titles ("DOT"). Tr. 27.

Alternatively, the ALJ proceeded to Step Five. There, she found that, as of the date last insured Iglesias was 60 years-old and thus closely approaching retirement age. *Id.* Further, he had at least a high school education and could communicate in English. *Id.* Given Iglesias's background and RFC, the ALJ adopted the VE's finding that Iglesias could also work as a laundry worker, inspector/sorter, and hand packager. Tr. 28.

The Appeals Council denied review, Tr. 1, and this action followed.

## DISCUSSION

Iglesias challenges the ALJ's determinations at Steps Three, Four, and Five. Dkt. 21. First, he argues that the ALJ's finding that he did not meet a listed impairment was not supported by substantial evidence. Dkt. 21 at 1. Second, he asserts the ALJ's finding regarding his RFC was unsupported by substantial evidence. *Id.* Lastly, he contests the ALJ's alternative finding that, even if he could not perform his past relevant work as a maintenance repairer, building, he could perform similar jobs the VE listed. *Id.* at 1, 12. I address each argument in turn.

### *Step Three*

Iglesias asserts that the ALJ erred in finding his impairments did not equal the severity of a listed impairment because there is evidence his major depressive disorder meets the Paragraph A, B, and C requirements of Listing 12.04. Dkt. 21 at 6. As mentioned above, the ALJ did not discuss the Paragraph A criteria, but analyzed the Paragraph B and C criteria. *See* Tr. 21–22. Because a claimant must satisfy either the Paragraph A and B criteria, or the Paragraph A and C criteria to meet Listing 12.04, I will assume the ALJ found that Iglesias satisfied the Paragraph A criteria. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.04. Iglesias argues he had established the

required two marked limitations in the Paragraph B areas of functioning as required by Listing 12.04 by citing his limitations understanding, remembering, or applying information and interacting with others. Dkt. 21 at 6–7. He quotes two pages of the ALJ's own recitation of his medical record, which I summarized above.

After quoting the ALJ's summary, Iglesias contests the ALJ's findings regarding the Paragraph B criteria. First, he argues Dr. Margarida Julia's records warrant finding Iglesias's memory is severely impaired and that the ALJ misinterpreted or misconstrued Dr. Margarida Julia's report by focusing on her refusal to diagnose Iglesias with a degenerative condition. Dkt. 21 at 9. Then, he contends the ALJ improperly relied on Dr. Colón Córdova's findings because they were internally inconsistent, unreliable, and lacked longitudinal perspective as they came from one evaluation. *Id.* at 9. The Commissioner does not discuss Dr. Margarida Julia's report. However, the Commissioner notes Dr. Colón Córdova described Iglesias's symptoms as mild to moderate, the same language used by the Social Security Administration for conditions that do not meet a Listing, and that Dr. Caro similarly testified that Iglesias did not meet Listing 12.04. Dkt. 25 at 11. Accordingly, the Commissioner concludes Iglesias improperly asks this court to re-weigh evidence in his favor, which it cannot do. *Id.* (citing 42 U.S.C. § 405(g); *Purdy*, 887 F.3d at 13).

I start with Dr. Margarida Julia's report. A claimant has a "moderate limitation" if his functioning in a Paragraph B area is "fair." 20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.00. "Marked limitation" means a claimant's functioning is "seriously limited." *Id.* And "extreme limitation" means a claimant cannot function in an area "on a sustained basis." *Id.* Dr. Margarida Julia found Iglesias's memory was significantly deteriorated. Tr. 692. Such a finding would seemingly equate at least to a marked limitation. However, other evidence in the record found Iglesias's memory adequate. Specifically, APS treatment records spanning from 2014 to 2019 repeatedly describe

Iglesias's memory as intact. Tr. 714, 719, 721, 978, 986, 993, 1000, 1007, 1014, 1019, 1023, 1026, 1028, 1055, 1062, 1069, 1115. Thus, far "more than a mere scintilla" of evidence supports the ALJ's conclusion. *Biestek*, 139 S.Ct. at 1154. Accordingly, it must be affirmed even if Dr. Margarida Julia's records "arguably could justify a different conclusion." *Rodríguez Pagán*, 819 F.2d at 3.

Turning to Dr. Colón Córdova's findings, Iglesias argues she inappropriately found his memory intact even though he could remember only two out of five pairs of words mentioned. Dkt. 21 at 9. Likewise, he questions why his short-term memory was described as good when he could only remember three out of eight words after one minute. *Id.* Further, he notes Dr. Colón Córdova's assessment of his long-term memory is not supported by the explanation of her examination and he argues his ability to spell "mundo" backwards and forwards does not evince an ability to work. *Id.* Again, I note that records from APS repeatedly describe Iglesias's memory as intact. Further, these are the type of longitudinal records which Iglesias insists are more insightful than Dr. Colón Córdova's one-time evaluation. *See* Dkt. 21 at 9. Moreover, as the Commissioner points out, resolving such inconsistencies in the record is a task for the ALJ, not this court. *See* 42 U.S.C. § 405(g); *Purdy*, 887 F.3d at 13. Accordingly, Dr. Colón Córdova's findings do not warrant determining that Iglesias had an extreme or marked limitation in understanding, remembering, or applying information.

Lastly, though Iglesias mentioned the ALJ erred when evaluating his ability to interact with others, Dkt. 21 at 7, he did not discuss any evidence related to that argument. In the ALJ's summary that he quoted, the ALJ noted that Dr. Colón Córdova found Iglesias did not want to be around people. *Id.* at 8. However, Dr. Colón Córdova nevertheless observed that Iglesias was cooperative, friendly, and answered questions appropriately. Dkt. 21 at 8 (citing Tr. 25). APS records show he

was logical relevant and coherent. *Id.* (citing Tr. 24). Hospital records from May 2014 also made

this observation. *Id.* Again, the ALJ was entitled to resolve any inconsistency in the records. And

because substantial evidence supports the ALJ's conclusion, it must be affirmed. *Rodríguez Pagán*,

819 F.2d at 3. Thus, the ALJ's finding that Iglesias did not meet the Paragraph B criteria of Listing

12.04 does not warrant remand.

       To satisfy the Paragraph C criteria of Listing 12.04, a claimant must demonstrate his mental

disorder is "serious and persistent." 20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.04. To do so, he must

have a medically documented history of the existence of the disorder over a period of at least two

years, including evidence of both:

   1. Medical treatment, mental health therapy, psychosocial support(s), or a highly
      structured setting(s) that is ongoing and that diminishes the symptoms and signs of
      your mental disorder (see 12.00G2b); and

   2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your
      environment or to demands that are not already part of your daily life (see
      12.00G2c).

*Id.* Listing 12.00(G)(2)(c) states in part the following:

       We will consider that you have achieved only marginal adjustment when the
       evidence shows that changes or increased demands have led to exacerbation of your
       symptoms and signs and to deterioration in your functioning; for example, you have
       become unable to function outside of your home or a more restrictive setting,
       without substantial psychosocial supports (see 12.00D). Such deterioration may
       have necessitated a significant change in medication or other treatment. Similarly,
       because of the nature of your mental disorder, evidence may document episodes of
       deterioration that have required you to be hospitalized or absent from work, making
       it difficult for you to sustain work activity over time.

20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.00. The ALJ's Paragraph C analysis states "[t]he record

does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to

adapt to changes in the claimant's environment or to demands that are not already part of the

claimant's daily life." Tr. 22.

Iglesias asserts the ALJ's boilerplate quotation of Paragraph C without explanation is insufficient. Dkt. 21 at 10. He further contends the RFC Dr. Caro proposed at the hearing meets the Paragraph C requirements. *Id.* However, as Iglesias admits, Dr. Caro explicitly stated Iglesias did not meet Listing 12.04. *Id.*; Tr. 69. While the ALJ ideally would have further explained her Paragraph C finding, "[a]n adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3." SSR 17-2p, 2017 WL 3928306, at *4 (S.S.A. Mar. 27, 2017). As summarized above, at Step 4, the ALJ reviewed the medical evidence in the record and explained its persuasiveness. Tr. 25–26. The ALJ discounted the two pieces of evidence, Dr. Herrman's 2011 evaluation and various GAF scores, stating Iglesias could not work. Tr. 26. The ALJ found Dr. Herrman's evaluation occurred outside the relevant period and evaluations during that time showed Iglesias had no cognitive problems. *Id.* And the ALJ found the GAF scores lacked a sufficient explanation. *Id.* The ALJ then found persuasive evidence that Iglesias could manage funds, perform simple instructions, concentrate on simple tasks for two-hour intervals, and interact with others. *Id.* As explained above, the ALJ is tasked with making these decisions, 42 U.S.C. § 405(g); *Purdy*, 887 F.3d at 13, and this court may not second-guess the ALJ when those decisions are based on substantial evidence, even if the record could arguably support another conclusion. *Rodríguez Pagán*, 819 F.2d at 3. Though Iglesias also argued the ALJ's failure to find marked limitations in the Paragraph B criteria led her to erroneously find he did not meet the Paragraph C criteria, Dt. 21 at 11, I already found the ALJ made appropriate findings regarding the Paragraph B criteria above. Accordingly, the ALJ's findings regarding Paragraph C are supported by substantial evidence.

### Step Four

Though Iglesias argues that the ALJ erred in evaluating his depression and anxiety's impact on his ability to work, he barely mentions this assertion beyond his discussion of the ALJ's findings regarding Listing 12.04. Iglesias appears to challenge the ALJ's RFC determination that he could perform simple, routine and repetitive tasks; make simple work-related decisions; interact frequently with supervisors and coworkers; and interact occasionally with the public. Dkt. 21 at 1; Tr. 23. To the extent Iglesias argues the ALJ improperly determined his RFC, and assuming he did not waive that argument by failing to develop it, the ALJ's analysis was nevertheless sufficient.

Iglesias asserts that, consistent with his assertion of a more than moderate memory impairment, he has severe difficulty in learning and remembering new information long enough to use it in a work setting. Dkt. 21 at 12. He also argues that, given his moderate limitations in social functioning, the ALJ should have found he could only occasionally interact with supervisors and coworkers. *Id.* He offers no further discussion of either argument. However, as discussed above, the ALJ's finding of a moderate memory impairment was supported by substantial evidence and thus cannot be disturbed. And as discussed, APS treatment records spanning from 2014 to 2019 repeatedly describe Iglesias's memory as intact. Tr. 714, 719, 721, 978, 986, 993, 1000, 1007, 1014, 1019, 1023, 1026, 1028, 1055, 1062, 1069, 1115. As for Iglesias's assertion he could only occasionally interact with supervisors and coworkers, Drs. Umpiere, Hernandez, and Caro agreed Iglesias retained the ability to interact effectively with both groups. Tr. 25–26 (citing Tr. 69, 92–93, 109–10). Dr. Colón further described him as cooperative and friendly, and verbally communicative. Tr. 669. Accordingly, substantial evidence supports the ALJ's conclusions regarding Iglesias's memory and social capabilities.

Finally, Iglesias contends the ALJ inappropriately classified his past relevant work as a maintenance worker (DOT 381-687-018). Dkt. 21 at 12. He insists this was a skilled job that should have been classified as Maintenance Repairer Building (DOT 899.381-010). *Id.* However, when the ALJ's hypothetical question to the VE accurately reflects a claimant's abilities, the ALJ may rely on the VE's finding that a claimant could perform past relevant work and was not disabled. *Hernandez v. Comm'r of Soc. Sec.*, 2012 WL 5199620, at *6 (D.P.R. Oct. 22, 2012). I note that "[w]hen there is an apparent unresolved conflict between VE or VS [vocational specialist] evidence and the DOT, the adjudicator must elicit a reasonable explanation . . . ." SSR 00-4P, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000). However, to be apparent, such a discrepancy must be "identified." *Aho v. Comm'r of Soc. Sec. Admin.*, 2011 WL 3511518, at *14 (D. Mass. Aug. 10, 2011) (citing in parenthetical *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)). Put another way, "[c]laimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Id.* (quoting in parenthetical *Carey v. Apfel*, 230 F.3d 131, 146–47 (5th Cir. 2000)). Accordingly, even assuming the DOT conflicts with the VE's classification of Iglesias's prior job as a maintenance worker (DOT 381-687-018), Iglesias waived his right to challenge the VE's classification by failing to object at the hearing. *See id.* Thus, Iglesias may not challenge the VE's classification of his maintenance work at this stage. Accordingly, the ALJ's finding that Iglesias is not disabled because he could perform past relevant work does not warrant remand.

***Step Five***

I note that Iglesias also challenges the ALJ's findings at Step Five. Here, he argues the skills required by the alternative listed jobs the ALJ found he could perform exceed those outlined in the RFC. Dkt. 21 at 12–13. Beyond his own review of the DOT, he cites no authority for his claim that the demands of the laundry worker, inspector/sorter, and hand packager jobs listed by the VE exceed his abilities as outlined in his RFC. I note that some part of the VE's testimony was not consistent with the DOT and that the VE apparently explained this discrepancy, but that portion of the VE's testimony is marked "inaudible" in the transcript. Tr. 78. The transcript does document that the VE based her assessment on her "experience, education and data from the Department of Labor and Statistics." *Id.* A VE may properly rely on such sources. *See Biestek*, 139 S. Ct. at 1152–53 ("[Vocational] experts may invoke not only publicly available sources," like the DOT, "but also 'information obtained directly from employers' and data otherwise developed from their own 'experience in job placement or career counseling.'") (quoting SSR 00-4p, 2000 WL 1898704, at *2). Thus, it is unclear that the VE testified improperly here.

Further, "the ALJ may rely on the testimony of the vocational expert even if it is inconsistent with the job descriptions set forth in the [DOT]." *Conn v. Sec'y of Health & Human Servs.*, 51 F.3d 607, 610 (6th Cir. 1995). However, before doing so, the ALJ must "elicit a reasonable explanation" for the conflict, resolve it, and explain this resolution. SSR 00-4p, 2000 WL 1898704, at *2. Here, as discussed, the VE's explanation was inaudible. Additionally, the ALJ did not explain her resolution of the conflict either on the record or in her decision. And if she did, that discussion was inaudible and thus unable to be transcribed. *See* Tr. 78. Either way, at least one court has found that such an omission from the record warrants remand because it impedes a court's ability to review the ALJ's reasoning. *Massachi v. Astrue*, 486 F.3d 1149, 1154 (9th Cir. 2007).

However, I already found the ALJ's decision that Iglesias could perform past relevant work and was thus not disabled was supported by substantial evidence at Step Four. Thus, the record's omission at Step 5 of why the VE deviated from the DOT and why the ALJ accepted that testimony is harmless. Accordingly, Iglesias's argument that the ALJ incorrectly relied on the VE does not warrant remand.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision **AFFIRMED.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 18th day of September 2023.


S/ *Bruce G. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge